## RICE, BARTON & FALES, Inc., v. COMMISSIONER OF INTERNAL REVENUE.

### No. 2413.

Circuit Court of Appeals, First Circuit.

June 5, 1930.

Harry Friedman, of Washington, D. C., for petitioner.

Randolph C. Shaw and J. Louis Monarch, Sp. Assts. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Joe S. Franklin, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for Commissioner.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

WILSON, Circuit Judge.

This is a petition for review of a decision of the Board of Tax Appeals sustaining the

action of the Commissioner of Internal Revenue in ordering the petitioner to pay a deficiency tax for the calendar year of 1921.

Some time in 1920, Mitsui & Co., Ltd., of Japan, ordered of the petitioner two very large machines for making book paper to be shipped to Japan. The machines were so large that they could not be assembled here and shipped, but had to be constructed in units and required twenty cars for their shipment by rail to the Pacific Coast from Worcester, Mass., where the petitioner's plant is located. They were not stock machines, or machines the petitioner manufactured according to stock patterns or designs, were described by no particular trade-name, but had to be specially designed for a particular purpose and use. By reason of their size it was not practical to assemble either of them here and test it as to its suitability. for the purpose for which they were ordered.

It is difficult to tell from the record just when the order for the machines was placed with the petitioner. A written form of a contract for their construction is made a part of the record which is dated October 1, 1920; the specifications attached are dated June, 1920. The contract provided that $10,000 was to be paid on the placing of the order, $25,000 on July 2, 1920, $25,000 on August 2, 1920, $25,333.33 on September 2, 1920, and the balance in cash "against shipping documents." The last of the parts of the machines were shipped in September, 1921. The final payment was made at this time. The various parts did not arrive in Japan until the spring of 1922, and were not fully assembled for testing until the late summer of that year.

The contract contained provisions designed for the protection of both parties: The petitioner, by the provision that payment should be fully made before shipment; the purchaser, by the guaranty of the design, material, and workmanship as specified, and the correct mechanical operation of its several component parts. These provisions were no doubt inserted owing to the nature of the machines, and the situs of the purchaser. It was impossible, or, at least, impractical, for the purchaser to inspect and test the machines until assembled in their plant, and the manufacturer would have been at a distinct disadvantage if it did not receive the contract price, which was $256,000, before shipment.

By reason of the nature of its business of constructing large machines requiring special designs and plans, the time frequently taken to complete an order, the express or implied obligation that a machine when delivered would be suitable for the purposes for which it was designed, and the need of adjustments after completion and delivery for proper mechanical operation, sometimes at considerable expense, the petitioner had, as early as 1920, at least, adopted the bookkeeping practice of not entering its profits on any contract until the machine had been accepted by the purchaser, or on a "finished or accepted contract plan," and this practice had been consistently followed in 1921 and 1922, authorized, as it claims, under section 212(b) of the Revenue Acts of 1918 and 1921 (40 Stat. 1064, 42 Stat. 237), and section 36 of article 45 of regulation 62 of the Bureau of Internal Revenue, which provides "that gross income may be reported in the taxable year in which the contract is finally completed and accepted if the taxpayer elects as a consistent practice to so treat such income, provided such method clearly reflects the net income."

"Net income [under section 212a] shall be computed 'in accordance with the method of accounting regularly employed in keeping the books of such taxpayer.'" Lucas v. American Code Co., 280 U. S. 445, 448, 50 S. Ct. 202, 203, 74 L. Ed. ——; United States v. Anderson, 269 U. S. 422, 439, 46 S. Ct. 131, 70 L. Ed. 347.

The Board of Tax Appeals undertook to differentiate the contract in this case from other contracts entered into by the appellant during the years 1920, 1921, and 1922 upon the ground that this was the only contract under which payment was received before delivery. Even so, though there is nothing in the record except an inference on which to base the conclusion that in no instance was any payment made before delivery except in the case of Mitsui & Company, we think it would make no difference under the Revenue Act and the practice of the petitioner in its method of bookkeeping whether payment was made before delivery or after.

The conclusions of the Board were evidently based on the theory that by payment of the purchase price and delivery to a carrier, title passed in 1921 and inspection was waived as a condition precedent to acceptance, and the guaranty of suitability and against defective parts was a condition subsequent and a collateral promise and analogous to the street construction contracts under consideration by the court in Uvalde Co., 1 B. T. A. 932; Cronin Co. v. Lewellyn (D. C.) 9 F.(2d) 974; Harrison v. Heiner (D. C.) 28 F.(2d) 985. But we think the situa-

tion in these cases, and in Vang v. Lewellyn (C. C. A.) 35 F.(2d) 283, cited by the government in its brief, is not analogous to the situation here. In those cases there was a considerable period of time following completion and acceptance of a street paving or street construction work in which the contractor agreed to maintain it against certain imperfections. The agreement to maintain was there clearly collateral, as was the guaranty in this case for a year against defective parts.

■■ Where a manufacturer undertakes to construct a special machine for a particular purpose he impliedly warrants it fit for that purpose, and such we construe to be the express warranty as to the design and correct mechanical operation of the component parts in the contract for the construction of these machines, and according to the testimony in behalf of the petitioner it was so understood. If the buyer has an opportunity for inspection before delivery and inspects or waives it, delivery may be held to be also an acceptance; but where inspection is impractical, as in this case, delivery to a carrier will not constitute acceptance, though it may pass title so far as the manufacture is concerned. It may be only a conditional title. Alden v. Hart, 161 Mass. 576, 581, 37 N. E. 742. The buyer has still the right of inspection, and if not as ordered, or if not suitable for the purpose for which designed, acceptance does not take place so as to bar the right of rejection until an opportunity for a practical inspection is afforded, which in this case could not be had until the machines were assembled and tested. Delaware, Lack. & W. R. R. v. United States, 231 U. S. 363, 372, 34 S. Ct. 65, 58 L. Ed. 269. In Pope v. Allis, 115 U. S. 363, 372, 6 S. Ct. 69, 73, 29 L. Ed. 393, the court says:

"When a vendor sells goods of a specified quality, but not in existence or ascertained, and undertakes to ship them to a distant buyer, when made or ascertained, and delivers them to the carrier for the purchaser, the latter is not bound to accept them without examination. The mere delivery of the goods by the vendor to the carrier does not necessarily bind the vendee to accept them. On their arrival he has the right to inspect them to ascertain whether they conform to the contract, and the right to inspect implies the right to reject them if they are not of the quality required by the contract."

In Webb Press Co., Ltd., 3 B. T. A. 247, 253, while payment had not been made prior to delivery in that case, it was held that the right of inspection was a condition precedent to acceptance. Whether under the conditions of the case at bar payment made on delivery to a carrier, when the contract contained an express guaranty of design, material, workmanship, and correct mechanical operation of the component parts, should be held to constitute a waiver of the right of inspection as a condition precedent to acceptance is a question permitting considerable latitude of refinement, depending on the circumstances. Williston in his usual thorough manner in his work on Sales, vol. I, §§ 170, 180, 181, 229, 232, 234, 235, vol. II, §§ 470, 473, 474, 482, 483, discusses the principles applicable to such a situation. The decisions, however, are, to say the least, confusing.

■ The purchaser under this contract certainly still had a right to reject the machines if they were not found to be of the design, material, and workmanship specified in the contract, or there was any lack of proper mechanical operation of the component parts that did not permit of reasonable adjustment. Whether the right of inspection and rejection as to design, material, workmanship, and mechanical operation under the circumstances here was a condition precedent or a condition subsequent, we think is immaterial as bearing on the issue in this case. There could be no more delay in exercising its right of rejection whether the condition was precedent or subsequent in its nature. It must be done in either case within a reasonable time, and the petitioner could not know whether the machines had been finally accepted until the inspection was made by the buyer. In any event the petitioner had consistently kept its books on the theory that, until this right was exercised, the contract was not "completed and accepted" within the meaning of section 36 of article 45 of regulation 62. Therefore, in accordance with its established practice of bookkeeping, the petitioner was warranted in accounting for the profits of the contract in the year 1922. It cannot be said that such a method does not reflect the income of the petitioner whether accounted for in 1921 or 1922. In this respect it differs from the street construction cases cited by the Board and from Lucas v. American Code Co., 280 U. S. 445, 50 S. Ct. 202, 74 L. Ed. 538, cited in the government's brief.

■ A second question is also raised. In 1916 the petitioner contracted with the Riordan Pulp & Paper Co., Ltd., of Montreal, Canada (now Kipewa Fibre Co.), for the manufacture of a machine and delivery not later than November 1, 1917, but on request

of the buyer, owing to war conditions, the petitioner consented to delay the delivery of the machine. After the close of the war the machine was constructed and was delivered, put in operation, and accepted in 1920. Owing to conditions following the war and increased costs of materials and labor, the petitioner sustained a loss on this contract of over $20,000. The petitioner admits that it had no valid claim against the buyer on account of the delay, as it consented to it. However, in 1919 it took the matter up with the buyer and, according to the only testimony in the case, the president and treasurer of the petitioner explained to the buyer that it was a hardship on his concern to assume this loss, and though he realized the buyer was under no obligation to do anything more in way of payment, he, in behalf of his company, as he expressed it, "threw himself on his hands and appealed to his sense of fair play as to what he could do for us in helping us out with the loss."

In October, 1920, the treasurer of the Riordan Company informed the petitioner that it would make a further payment to the extent of $20,000. Witness further testified that he did not suggest any amount that the Riordan Company should contribute, but merely told their treasurer that the petitioner's loss was roughly $20,000, and when they offered to pay the $20,000 "it was absolutely out of the clouds."

The Commissioner and the Board held that the payment was income within the meaning of the Revenue Act and was received in 1921 because it was entered on the books on January 3, 1921. The petitioner contends that it was not income at all within the meaning and construction put upon the act by the Supreme Court, but a gratuity.

Not all receipts are income within the meaning of the act. The Supreme Court in Eisner v. Macomber, 252 U. S. 189, 207, 40 S. Ct. 189, 190, 64 L. Ed. 521, 9 A. L. R. 1570, defined income under the Revenue Act as "gain derived from capital," from labor, or both combined, provided it be understood to include profit gained through the sale or conversion of capital assets, and, further, that it did not include "gain accruing to capital," not a growth or increment in value in the investment, but a "gain or profit proceeding from capital."

Again in Bowers v. Kerbaugh-Empire Co., 271 U. S. 170, 174, 46 S. Ct. 449, 451, 70 L. Ed. 886, the court said, approving the above definition: "After full consideration, this court declared that income may be de-

fined as gain derived from capital, from labor, or from both combined, including profit gained through sale or conversion of capital."

In Sanford & Brooks Co. v. Commissioner (C. C. A.) 35 F.(2d) 312, the Circuit Court in the Fourth Circuit held that income is not synonymous with receipts and cites the above cases as defining income, and held that the receipt of a sum in reimbursement of losses suffered under a contract was not a gain or profit resulting from capital or labor or the sale of capital assets. There the sum received might have been considered as due the taxpayer, it being received from a claim against the United States which was recovered in the Court of Claims. Here there was clearly no legal obligation on the part of the Riordan Company to make good the loss suffered by the petitioner. All the petitioner was legally entitled to as gain from its capital invested and labor or both, or from the sale of any capital assets under the contract, it had already received. The additional sum was clearly a pure gratuity given from a sense of fair play in business, an exhibition both commendable and refreshing to find in these days. It was not taxable income within the meaning of the Revenue Act.

As the court said in Bowers v. Kerbaugh-Empire Co., supra: "The mere diminution of loss is not gain, profit, or income."

The decision of the Board of Tax Appeals is reversed, and the case is remanded to the Board for further proceedings not inconsistent with this opinion.